# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF MISSISSIPPI
### ABERDEEN DIVISION

| | |
|---|---|
| 16 FRONT STREET LLC, and<br>C. RICHARD COTTON,<br><br>       Plaintiffs,<br><br>               v.<br><br>MISSISSIPPI SILICON, LLC,<br><br>       Defendant. | Civil Action No.<br><br><u>  1:14CV183-SA-DAS  </u> |

# COMPLAINT

This is a Citizen Suit under the Clean Air Act, 42 U.S.C. §7401 *et seq. See* 42 U.S. Code § 7604(a)(3). Plaintiffs 16 Front Street LLC ("16 Front Street") and C. Richard Cotton (collectively, "Plaintiffs"), as and for their complaint for injunctive relief and civil penalties against defendant Mississippi Silicon, LLC ("MS Silicon"), state:

## I.
## Parties

1.     16 Front Street is a Delaware limited liability company. 16 Front Street owns real property and improvements thereon in Burnsville, Tishomingo County, Mississippi.

2.     C. Richard Cotton ("Cotton") is a resident of Saltillo, Lee County, Mississippi. Cotton is a freelance writer and photographer whose work takes him to Tishomingo County and nearby areas on a regular basis. Cotton also regularly visits Pickwick Landing, Pickwick Lake, and Bay Springs Lake for recreation and to enjoy the aesthetic values of these parks, including the clear, clean air, the absence of dust and odors, the clear water and healthy vegetation. *See*

Affidavit of C. Richard Cotton, attached as Exhibit 1 hereto.

3.      16 Front Street and Cotton have standing to bring this lawsuit under 42 U.S.C. §
7604(a)(3).  *See*, *e.g.*, *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918 (7th
Cir. 2008) (holding that plaintiff had associational standing to challenge construction without a
PSD permit where individual member visited lake every other year to enjoy its natural beauty
and clean environment, and alleged that she would stop visiting the lake if emissions from the
proposed plant at issue diminished her aesthetic enjoyment of the lake).

4.      On information and belief, MS Silicon is an Ohio limited liability company with a
principal place of business in Burnsville, Tishomingo County, Mississippi.

# II.
# Jurisdiction and Venue

5.      In this Citizens Suit, Plaintiffs seek to enjoin MS Silicon from continuing to
construct a new major emitting facility without a permit required under the prevention of
significant deterioration provisions of the Clean Air Act, 42 U.S.C. § 7470, *et seq.* ("PSD") and
federally enforceable provisions of the Mississippi state implementation plan (the "SIP").

6.      The Court has jurisdiction, under 42 U.S.C. § 7604(a)(3), over Plaintiffs' claim
that MS Silicon is constructing a new major emitting facility without a permit required under
PSD.  *See Citizens for Pennsylvania's Future v. Ultra Resources, Inc.*, 898 F. Supp. 2d 741, 746
(M.D. Pa. 2012) (citing *Weiler v. Chatham Forest Prod., Inc.*, 393 F.3d 532 (2d Cir. 2004))
(holding district court has jurisdiction under § 7604(a)(3) where construction is authorized by a
permit that is not a PSD permit).

7.      42 U.S.C. § 7604(b)(1) does not require service of any notice before filing claims

**COMPLAINT—PAGE 2 of 14**

under 42 U.S.C. § 7604(a)(3).

8.     The subject air pollution source is a planned silicon metal manufacturing plant that MS Silicon is presently constructing in Burnsville, Tishomingo County, Mississippi (the "Plant").  Venue is proper in the Northern District of Mississippi pursuant to 28 U.S.C. § 1391(b)(2).

9.     If built as planned, emissions of air pollutants from the Plant will adversely affect air quality in Burnsville and surrounding areas, including but not limited to Pickwick Landing Dam, Pickwick Lake and Bay Springs Lake.

## III.
## Background

10.     The Clean Air Act ("CAA") prohibits construction of a new major source of air pollutants unless a permit has been issued "in accordance with this part [part C, chapter 1 of the CAA - *i.e.,* PSD]."  42 U.S.C. § 7475(a)(1).

11.     At all relevant times, the Mississippi Department of Environmental Quality, an executive agency of the State of Mississippi ("MDEQ"), was authorized by federal law to issue permits to new major sources of air pollutants in Mississippi pursuant to regulations APC-S-2 (2005) and APC-S-5 (2011).  *See* 40 C.F.R. Part 52, Subpart Z (2013).

12.     APC-S-5 incorporates by reference the provisions of 40 C.F.R. § 51.166(q) and 40 C.F.R. § 52.21, as amended Nov. 4, 2011, except (as relevant here) § 52.21(q), both with minor wording changes to reflect the fact that MDEQ, and not the U.S. Environmental Protection Agency ("EPA"), is the permitting authority and charged, *inter alia,* with responsibility for strict observance of the public participation procedures of the CAA.

13.     Under PSD, a new "major emitting facility" or "major source of air pollutants" is any new stationary source that has the potential to emit more than 250 tons per year of any regulated new source review ("NSR") pollutant, including sulfur dioxide ("SO2"), nitrogen oxides ("NOx"), particulate matter ("PM"), volatile organic compounds ("VOC") and carbon monoxide ("CO"). 42 U.S.C . § 7479; 40 C.F.R. § 52.21(b)(1).

14.     Each proposed emission unit at a new major emitting facility must be expressly authorized in a permit issued in accordance with PSD, including emission limitations representing continuous emission reductions based on the best available control technology ("BACT") applicable to that emissions unit. 42 U.S.C. §§ 7475(a)(4), 7479(3) and 7601(k); 40 C.F.R. §§ 52.21(b) and (j).

15.     One of Congress' declared purposes in enacting PSD was "to assure that any decision to permit increased air pollution in any area to which this section [PSD] applies is made only after careful evaluation of all the consequences of such a decision and *after adequate procedural opportunities for informed public participation in the decisionmaking process*." 42 U.S.C. § 7470(5) (emphasis added).

16.     Under the Mississippi SIP, a permit has not been issued in accordance with PSD -- and thus is not a PSD permit -- unless the permit applicant (in this case MS Silicon) and MDEQ (the permitting authority) meet all applicable procedural requirements, including without limitation by taking the following steps:

(a)     The applicant demonstrates that emissions from the proposed facility will not cause or contribute to an exceedance of any national ambient air quality standard ("NAAQS") or maximum allowable increase in the area ("PSD increment"). 42 U.S.C. § 7475(a)(3); 40 C.F.R.

**COMPLAINT—PAGE 4 of 14**

§ 52.21(k); APC-S-5.

(b)     The proposed permit and all materials submitted by the applicant -- including specifications and drawings, the typical operating schedule, a detailed construction schedule, emission estimates, detailed descriptions of proposed BACT, and air quality impact analyses of the air quality impacts of the source -- are available for public review, in the area in which the source will be located, for not less than 30 days before the permit is issued.  40 C.F.R. §§ 51.160-161 and 166(q); 40 C.F.R. § 52.21(n); APC-S-2; APC-S-5.

(c)     MDEQ holds a public hearing before issuing the final permit, with an opportunity at that mandatory hearing for interested persons to make written or oral comments on the air quality impacts of and control technology requirements for the new major source.  42 §§ 7475(a)(2) and 7475(e)(2); 40 C.F.R. § 51.166(q); 40 C.F.R. § 52.21(j)-(k); APC-S-2; APC-S-5.

17.     Under the Mississippi SIP, a permit for a new major source of air pollutants must state that the source will meet all the requirements under PSD, including the pre-permit public participation requirements.  If the permit does not expressly or impliedly state that the public participation requirements have been met, actual construction of the source may not lawfully commence.  40 C.F.R. § 52.21(a)(2)(iii).

18.     Under the Mississippi SIP, construction of a new major source of air pollutants that is not in accordance with the permit application or the terms of the permit is subject to appropriate enforcement action.  40 C.F.R. § 52.21(r)(1).

## IV.
## Factual Allegations

19.     Tishomingo County is an "attainment area" for all regulated NSR pollutants and,

therefore, is subject to the pre-construction permit requirements under PSD.

20.     In August 2013, MS Silicon submitted a permit application to MDEQ, seeking issuance of a permit to construct the Plant.

21.     On about November 27, 2013, MDEQ issued permit no. 2640-00060 (the "Permit") to MS Silicon, purporting to authorize MS Silicon to construct a new silicon metal manufacturing facility.

22.     The Permit authorizes the Plant to emit at least 2,170 tons per year of SO2, 1,906 tons per year of NOx, and 1,444 tons per year of CO.

23.     The Plant is a new major emitting facility.

24.     Construction of the Plant commenced on or around January 2014.

## Public Participation Deficiencies

25.     MS Silicon submitted air quality impact modeling to MDEQ in October 2013.

26.     On about October 21, 2013, MDEQ made a preliminary determination to issue the Permit to MS Silicon.

27.     Notice of the preliminary determination to issue the Permit was published in the Northeast Mississippi Daily Journal on October 24, 2013 (the "Notice").

28.     The Notice provides that public comments must be received no later November 22, 2013.

29.     Under Mississippi law, the day of publication of the required public notice of the proposed permit does not count toward the minimum 30-day public comment period. Miss. Code § 1-3-67.

30.     Contrary to PSD and the SIP, the Notice, on its face, allows the public only 29

**COMPLAINT—PAGE 6 of 14**

days to comment on the proposed permit.

31.     MDEQ sent copies of the Notice, MDEQ's PSD air quality analysis project summary, MDEQ's pre-construction review and preliminary determination to issue the Permit, and a draft of the Permit, to the Burnsville Public Library in Burnsville, Mississippi ("Library"), with a letter ("Cover Letter") requesting that the Library make the information available for public review until November 22, 2013.  In the Cover Letter, MDEQ instructed the Library that the information could be discarded after November 22, 2013.

32.     Although the Cover Letter is dated October 23, 2014, the Cover Letter and its enclosures were not delivered to the Library until October 29, 2013 and were not available for review by members of the public until at least that time.

33.     Accordingly, contrary to PSD, the public had at most 24 days in which to review the aforementioned materials.

34.     Further, and likewise contrary to PSD, the Library never received, and the public therefore never had the required opportunity to review and comment on, MS Silicon's permit application, MS Silicon's October air quality impact modeling, specifications and drawings, or any other information MS Silicon submitted to MDEQ in support of its permit application.

35.     On about November 22, 2013, MS Silicon submitted a supplemental air quality impact modeling report to MDEQ.  This modeling report was likewise never delivered to the Library, such that the public never had the required 30-day opportunity to review and comment on the same.

36.     Contrary to PSD, MDEQ did not provide the public an opportunity to appear at a public hearing to make oral comments on the air quality impacts of and control technology

**COMPLAINT—PAGE 7 of 14**

requirements for the Plant.

37.     Rather, MDEQ issued the Permit without holding a public hearing.

38.     The Permit states that it was issued under MDEQ's authority under 40 C.F.R. §
52.20(a) and 52.21, but does not state that it was issued in accordance with the applicable public
participation requirements in 40 C.F.R. §§ 51.160-161 and 166(q).

39.     In fact, the Permit was not issued in accordance with the public participation
requirements in 42 U.S.C. §§ 7475(a) and 7475(e) and the rules in 40 C.F.R. § 51.160-161 and
166(q); therefore, the Permit is not a "PSD permit."

## Willful Misconduct

40.     MS Silicon and/or MDEQ intentionally abbreviated or omitted the legally
required opportunities for public review and comment to prevent objections from Nucor
Corporation, which was (and still is) objecting to a PSD permit issued to Big River Steel LLC in
Arkansas, an entity which, on information and belief, is an affiliate of MS Silicon -- John D.
Correnti, a former Nucor executive, being Chairman of both Big River Steel LLC and MS
Silicon.  The public-at-large, including Plaintiffs, has born the adverse effect of the steps taken to
prevent objections from Nucor Corporation.

41.     Contrary to the SIP, MDEQ did not make copies of MS Silicon's air quality
impact modeling reports available for public inspection at the Library.  Instead, MDEQ provided
air quality impact summaries that had been prepared by MDEQ and MS Silicon.  These
summaries purport to identify the areas in which permitted emissions from the Plant will cause
significant impacts.  These summaries also purport to demonstrate that permitted emissions from
the Plant will not cause or contribute to violations of any NAAQS.  In fact, however, these

summaries do not reflect the results of MS Silicon's air quality impact modeling of permitted emissions from the Plant, as PSD requires. Instead, these summaries improperly reflect modeling of lesser emissions amounting only to about 50% of the permitted emissions.

42.    The public could not have discerned, using only the information made available at the Burnsville Public Library, that the subject air quality impact analyses are not based on permitted emissions. This fact could only be discerned by reviewing the full air quality impact modeling reports submitted by MS Silicon to MDEQ, which, as noted, were *not* made available at the Burnsville Public Library.

43.    Contrary to the incomplete and misleading air quality impact information MS Silicon and/or MDEQ selectively disclosed to the public, permitted emissions from the Plant will, in fact, cause violations of several NAAQS and will significantly impact large areas beyond Tishomingo County, including in the states of Alabama and Tennessee.

44.    As late as June 2014, EPA was not satisfied with MS Silicon's attempts to demonstrate that the Plant will not cause NAAQS violations. On information and belief, the EPA remains dissatisfied with those efforts and with the Permit as issued.

## Construction of Stacks Not in Accordance with Air Quality Modeling

45.    The largest sources of emissions at the Plant will be four submerged arc furnaces ("SAFs"). Each SAF individually is a major source of regulated NSR pollutants.

46.    The air quality impact analyses made available for public review at the Burnsville Public Library indicate that the proposed Plant would emit air pollutants from the SAFs through stacks that are 91.44 meters (300 feet) tall and 1.93 meters (6.33 feet) in diameter, and with an exit temperature of $449.82^{o}$K ($350^{o}$F).

**COMPLAINT—PAGE 9 of 14**

47.     On information and belief, the SAF stacks that MS Silicon plans to construct will be 300 feet tall, but will have a diameter of 15 feet and an exit temperature of 140$^o$F.

48.     Larger stack diameters and lower exit temperatures decrease the velocity and buoyancy of emission plumes; these decreases have the effect of increasing ground level impacts.  Therefore, with the stacks MS Silicon intends to construct, actual air quality impacts from the Plant will be materially worse than the air quality impacts described in the materials MDEQ made available for public review and comment.

## Unpermitted Emission Sources

49.     Cooling water and silicon metal product loading systems are necessary components of a silicon metal manufacturing facility.

50.     On information and belief, the Plant will utilize cooling water, with "recooling" systems, to cool the submerged arc furnaces.

51.     On information and belief, the Plant will include cooling towers to provide cooling water.

52.     On information and belief, the Plant will include systems to load crushed silicon metal and silica fume into bags, trucks, railcars and/or barges.

53.     A cooling tower is a significant source of PM10 and PM2.5 emissions if not properly controlled.

54.     Silicon metal product loading is a significant source of PM10 and PM2.5 emissions if not properly controlled.

55.     BACT for cooling towers typically includes the use of internal baffles and total dissolved solids ("TDS") limitations on recycled cooling water.

56.     BACT for silicon metal product loading systems typically includes some form of enclosure and/or aspiration to a control device.

57.     MS Silicon's permit application does not provide any information regarding emissions or control technologies for cooling towers and silicon metal product loading.

58.     MS Silicon's air quality impact analyses do not account for emissions from cooling towers or silicon metal product loading.

59.     The Permit does not include emissions limitations or control requirements for cooling towers or silicon metal product loading.

60.     The Permit does not authorize MS Silicon to construct cooling towers or silicon metal product loading operations.

<u>Public Interest</u>

61.     Plaintiffs will be irreparably harmed if MS Silicon continues to construct the Plant without obtaining a PSD permit pursuant to 42 U.S.C. § 7475 and the SIP.  Plaintiffs will have lost statutorily prescribed rights of informed participation in the MDEQ's decision to permit construction of the Plant and thereby permit increased air pollution in the areas in which Plaintiffs reside, work, recreate and/or own property.  More effective control technologies that would be technically and economically feasible if included in the preliminary design of the Plant may become unfeasible as a result of the design and layout of the Plant if constructed as proposed and allowed by the Permit.  Plaintiffs will be subjected to unhealthy, harmful and damaging air pollution if the Plant is constructed as proposed and operated as allowed by the Permit.

62.     MS Silicon has no legally cognizable interest in continuing to construct the Plant

without a PSD permit.

63.     The public interest will be served by enjoining MS Silicon from continuing to construct the Plant until such time as MS Silicon obtains a PSD permit that has been issued in accordance with all the requirements of PSD and the SIP, including the public participation requirements in 40 C.F.R. §§ 51.160-161 and 166(q), from continuing to construct SAF stacks that are not in conformity with its own air quality impact analyses, and from continuing to construct the cooling towers, silicon metal product loading equipment, and other emission units not specifically authorized in any permit.

# V.
# Claims

## Count I:  Violations of 42 U.S.C. § 7475(a) and the SIP

64.     Plaintiffs incorporate by reference the allegations in paragraphs 1-63 above.

65.     MS Silicon is constructing a new major emitting facility without a PSD permit, in violation of 42 U.S.C. § 7475(a)(1) and APC-S-5.

66.     MS Silicon is constructing a new major emitting facility that is not in accordance with the materials it submitted to MDEQ and upon which MDEQ made the determination to issue the Permit, in violation of APC-S-5.

67.     MS Silicon is constructing emission units that are not authorized by any permit, in violation of 42 U.S.C. § 7475(a)(1) and APC-S-5.

68.     Plaintiffs are entitled to an order enjoining MS Silicon from continuing to construct the Plant in violation of 42 U.S.C. § 7475 and APC-S-5.

# VI.
# Prayer for Relief

Plaintiffs respectfully request the Court to enter judgment for Plaintiffs and against MS

Silicon, and enter an order:

1)    enjoining MS Silicon from continuing to construct any part of the Plant until such
      time as MS Silicon obtains a pre-construction permit, for all sources of emissions
      of regulated NSR pollutants, issued in accordance with 42 U.S.C. § 7475 and the
      SIP, requiring in particular:

      (a) a full 30-day opportunity for the public to review and comment on: the air
      quality impacts of permitted emissions from the Plant, considering actual stack
      parameters and all emission units at the Plant; control technology determinations;
      and other appropriate considerations;

      (b) a full 30-day opportunity for the public to review the application, air quality
      impact modeling, drawings and specification, and any other information
      submitted by MS Silicon in support of the permit, at the Burnsville Library; and

      (c) a public hearing to provide an opportunity for the public to appear and make
      oral or written comments.

2)    assessing civil penalties against MS Silicon pursuant to 42 U.S.C. §§ 7413(d) and
      7604;

3)    awarding Plaintiffs their costs and fees (including reasonable attorney and expert
      witness fees) pursuant to 42 U.S.C. § 7604; and

4)    awarding Plaintiffs all other just and equitable relief.

                              Respectfully submitted,

                              s/ Ronnie Musgrove
                              _____
                              RONNIE MUSGROVE (MSB #3698)
                              **ATTORNEY FOR PLAINTIFFS**

**COMPLAINT—PAGE 13 of 14**

OF COUNSEL:

**MUSGROVE/SMITH LAW**
1635 Lelia Drive, Suite 104 (39216)
Post Office Box 4670
Jackson, MS 39296
Telephone:     601-852-1696
Facsimile:     601-852-1714